Case No. 25-5177, et al. Novartis Pharmaceuticals Corporation, et al. v. Robert F. Kennedy, Jr. in his official capacity as Secretary of the United States Department of Health and Human Services, et al. Ms. Stetson for the Novartis, et al. Mr. Hanward for Fallon Johnson & Johnson Healthcare Systems Inc. Mr. Golding for the employees. Mr. Schultz for the intervener employees. Ms. Stetson, good morning. Good morning. I know that we had lost you to academia, but I'm glad to know that's not altogether true. I appreciate that, Your Honor. Thank you. Good morning, Your Honors. May it please the Court. My name is Kate Stetson. I represent the appellants BMS, Lilly, and Novartis. This is a case about the limits on an agency's statutory authority, not just whether the agency can exercise authority, but how it must do it. The agency here, HRSA, prohibited pharmaceutical makers from implementing 340B pricing with discounts or rebates, I should say, claiming that any rebate arrangement required preapproval. But HRSA doesn't have roving statutory preapproval authority. If HRSA wishes to prescribe a particular rebate process or discount process, the statute supplies one way for HRSA to do it, and that's through the pharmaceutical pricing agreements, or PPAs, with the manufacturers. There are no prescriptions in the PPAs for a particular rebate process or discount process. Therefore, manufacturers are entitled to implement customary business practices, just as they would with other purchasers, just as this Court suggested in Novartis would be the case, as long as the terms of an offer were reasonable. That should end this case. What the Secretary relies on is this provision in the statute that contains a parenthetical phrase, as provided by the Secretary. So this is 340BA1. And I want to emphasize sort of the sandwich of words before and after that parenthetical. You have a header that says requirements for agreement. You have the first line, the Secretary shall enter into an agreement. The second line, under which the amount required to be paid, perens, taking into account any rebate or discount, as provided by the Secretary, to the manufacturer does not exceed an amount equal to the average manufacturer price reduced by the rebate percentage. I'm shorthanding. So that entire provision has to do with the pharmaceutical pricing agreement. And that makes sense, of course, because as we know from other cases, Congress was almost notoriously stingy with the authority. Yes, sorry. Finish your thought. I'll finish the sentence. Stingy with the authority that it gave HRSA. Very limited rulemaking authority, limited authority under the PPA in the way that it could exercise its authority. So the government has this argument that all this stuff about it has to be in the agreement doesn't get you where you need to go. Because, in fact, the result would be the agreement does not provide for a rebate mechanism, and so you can't do it. So it seems to me that this case is actually about a predicate question of what the statutory baseline is. It's either you get to do whatever you want until the Secretary says otherwise, or there's some default and you need the Secretary's permission. Right. So just to qualify, the manufacturers wouldn't get to do whatever they want, of course. They would have to be, just as this court said in Novartis, in a different circumstance, standard customary business practices. Nobody disputes that the rebate processes that we're talking about here are standard business practices. Of course they are. But on your question, I think the government has actually answered that itself twice. The first time it did so, it did so with respect to the AIDS drug assistance programs, ADAPTS. So if you look in the Joint Appendix at pages 410 through 413, this is the beginning of Volume 2, what you'll find are the references to the after-the-fact request for comment and ultimate Federal Register notice about the ADAPT rebates. And one of the things that you'll see commenters ask was, what's the process for the rebates? How are these rebates going to be implemented? And over and over again, Joint Appendix 410, 411, 412, 413, what the agency says is, ADAPTS and manufacturers are encouraged to follow standard business practices in designing the contracts and agreements for such a rebate mechanism. So that's point one. Point two is, government counsel below at Joint Appendix 336 said in response to Judge Friedrich's question about how these rebate processes would be implemented, we wouldn't amend the PPA. They would implement them just as with ADAPTS. So I think that answers the question. The PPAs are fine and operative and workable as they are. It's only if HRSA takes the unusual step of wanting to prescribe a particular rebate mechanism or discount mechanism in the agreement itself that it would run into the issue where it would have to amend the PPA. The default in your formulation, Judge Garcia, is a customary business practice, exactly as this Court suggested in Novartis. And as I mentioned, no one in this room... So I think this parenthetical is confounding, for sure, in both directions. But maybe you can disabuse me of the following, which is, it seems like your position is that this means that the phrase taking into account any rebate or discount as provided by the Secretary means unless prohibited by the Secretary. And it seems it's at least much closer to taking into account any rebate if allowed by the Secretary. Right. Well, I think there are a couple things, Judge Garcia, if you'll indulge me to unpack that a little bit. The first is the 340B price is a lower price. So it's not a question about the Secretary needing to put something in the PPA other than what's already there to effectuate the 340B price. That's what the rest of that provision under 1A is, how you get to that price. So with respect to the PPA not separately providing for a particular rebate or discount mechanism, I think that's a tell, in a way. If you look at the PPA itself, you can see this, the Joint Appendix 435 and 438. The PPA actually doesn't include this parenthetical at all. It paraphrases A-1. The manufacturer agrees to charge a price for covered outpatient drugs that will not exceed the average manufacturer price decreased by a rebate percentage. So, in other words, it says the price will not exceed the ceiling price. Yes. And one view would be that means, as a default, you have to charge the ceiling price at the point of purchase. And if you want to deviate via a rebate or some kind of creative discount mechanism, you have to go to the Secretary for approval. It might be there's a specialized understanding in the pharmaceutical industry that price can be accomplished in different ways. But there's also a plain meaning version of it that says if the ceiling price is $100, the default is when you say here's how much for this, you say it's $100, not $200, but I'll give you a rebate next week. Oh, I think it's common parlance to say this is $100. You pay $200, I'll give you the $100 back. And more importantly, the 340B price is a lower price. It's effectuated by one of two ways, right, an upfront discount or a back-end rebate. So the idea that there is no rebate or discount suggested by the current PPAs is a bit of a fiction. Of course there's a discount. That's how the 340B price works. I guess we can imagine a world where the 340B price is actually the same as the other prices that these manufacturers charge. But it has to be effectuated either by a rebate or by a discount. We know that both are permissible under the statute. The only question remaining is does the agreement make provision for some particular rebate or discount process that a manufacturer and a covered entity must follow? But isn't the point who is the decision-maker? Is it the manufacturers in the first instance? And I hear you, you know, business practices, customary business practices. But there's no – I mean, that's the point in this case is that there isn't a necessarily lawful customary business practice of manufacturer-initiated rebates, right? It's the providers who initiated it in the state AIDS clinic situation. And so that's really the question for us is who is the decision-maker? And as I read the statute, it contemplates that the secretary is the decision-maker on that. Well, Judge Pillard, first of all, I want to pay first attention to the comment you made about these rebate processes not being necessarily lawful customary business practices. I don't see any dispute anywhere on this record that these rebate models are anything but customary business practices. The question whether they're lawful, of course, is that HRSA's contention here that these manufacturers are prohibited from implementing rebates unless or until the manufacturer – The question is who decides before it gets implemented. So if you just took the position that it was a customary business practice to give a rebate a year later, knowing in advance that that's going to dissuade covered entities from participating, the whole concern is that maybe the secretary ought to decide that and not the manufacturers. Two points. And I do want to get back to this who decides question because the statute supplies the answer. But the response is the rebates here, we're talking about 7 days or 10 days. If we had a situation hypothetically where a manufacturer said, you'll get your rebate, just stick around for a couple of years and we'll send you the money, that is an egregious nonstandard business practice. And the manufacturer would presumably be subject to civil monetary penalties, which, of course, is one of the few things the agency can prescribe. What provision of the statute would it violate? Is it the shall offer provision? What provision would that violate? Yeah, I think it maps on to the panel's discussion in Novartis pretty well in that respect. There are certain types of standard contract behaviors that are wrapped into the PPA and into the transactions between the covered entities and the manufacturers, just as in any other standard contract. So, yes, I think it would be a breach of contract remedy by the providers if we wait for more than 7 to 10 days. I think more to 7, let's say somebody came in and said, I was told 7 to 10 days and I didn't get my rebate on the morning of the 11th day. I think HRSA would probably exercise its enforcement discretion not to pursue that manufacturer. If you had someone come in under Judge Garcia's formulation and said, I was told I'm not going to get my rebate until 2029, that is something that HRSA presumably could issue civil monetary penalties. What would that be enforcing? It would be enforcing the 340B statute's must-shall-offer provision, among other things. I think that's probably the best hook for it. But I want to get back to this 7 to 10 days. I mean, why not 6 weeks? I think, but let me pause because I was about to say that sounds like a standard business practice to me, but that's not in this record. What's in this record is that these manufacturers are offering their rebates within a week to 10 days, which is, you know, if anything, a highly favorable business practice vis-a-vis the covered entities. I want to make sure I touch on this who decides question, though, because I think this is the crux of both of your questions, Judge Hill or Judge Garcia. The issue of who decides is also resolved by the statute. The statute says taking into account any rebate or discount as provided by the secretary. Then the question is provided where? You have this entire statute provision that sets out the requirements for an agreement in the header, the agreement, such agreement, under the agreement. And so under the secretary's argument, what the secretary is suggesting is that that little parenthetical actually can exist somewhere outside the agreement. But provided where, when, or if the secretary decides to implement a particular rebate process, which it has not done, it may only do so in the PPA. Unless or until that happens, it's just a customary business practice. As provided by the secretary is a pretty strange way of saying as provided by the agreement. If I say as provided by the secretary, it sounds like it's unilaterally decided, whereas agreement is a mutually agreed term. I think in some ways, first of all, it's a contest of strangeness. I think it's far more passing strange for something to be completely divorced from agreement, agreement, agreement, agreement to suggest that the secretary can elsewhere provide somewhere for that particular rebate or discount model. But more to the point, if it said as provided in the agreement, that probably would be an express prerequisite that a rebate or discount model be specified in the agreement. As provided by the secretary leaves discretion. If the secretary wants to do this rebate model pilot program, and what is it that diverges under the secretary's proposed rebate model pilot program from your proposed rebate models? Would you be satisfied with a rebate model that tracks what the government is currently piloting? I think we would be satisfied. I have to hesitate because there are a number of different programs that have my clients have different platforms, software platforms that carry out their rebate models. I think to the extent that the manufacturers are operating rebate model programs throughout the pilot program that look like the rebate models they would implement here, that's fine. The problem with the pilot program, of course, is it only applies to manufacturers whose drugs have been chosen for drug price negotiation and only to those drugs. That solves only one part of the significant problem that we identified below. It solves the immediate impossibility problems created by the MSP and the inflation rebate issues. It does not solve the hemorrhaging problem with respect to duplicate discounts and diversion that we're talking about. If the secretary just wants to do the pilot program and doesn't want to make a determination about rebates until that pilot is concluded, on your view of the agreement as being the place where the secretary provides, then it would be permissible for HRSA to just next week, tomorrow, change the agreements so that rebates would not be permitted except under the pilot unless and until the secretary has made a determination based on the data gained. Two points. I think that change itself would be subject to notice and comment because that's the way that HRSA has proceeded before in that event. We'd have a whole separate issue about it. Wait. Does the agreements by notice and comment? I'm sorry. Does the agreement specify? No. It writes the agreements by notice and comment. It writes the one time it's amended the agreements in the past, which was after the Affordable Care Act. It did so through a notice and comment process. But the other thing I want to make clear. That was to conform it to the statute, though. Yes. Yes. But typically, if it wants to change something in the agreement, it does a notice and comment. I think the one time that it has changed anything, it has been through notice and comment. But is it your position that it would have to? I take it your position is that it would have to do that through notice and comment. I think it's a – I described it to the district court as a down-the-road question. Our position is that's the way they've done it before. It conforms with the limited statutory authority that HRSA has. This is a spending clause provision, after all. So, giving the manufacturers an opportunity to understand and comment on what they're signing up for is particularly important. But let me make one – I'm sorry. Just a practical question. These are annual contracts. Is that right? Correct. They renew each year? They're renewed year on year.  So, at a minimum, separate from notice and comment, if the secretary wanted to insert some new prohibition, it could do it for the upcoming PPA year, and then there would be questions about whether that's arbitrary and capricious and all that. But it would have that authority? It would have that authority subject to the notice and comment issue that we've been talking about, subject to any arbitrary and capricious – I guess I'm just trying to make sure I understand that if it is the case that the manufacturers leave, the question is for how long?  So, maybe a year. I know there's a 60-day notice provision, but okay. Right, right. And I think that triggers the other point that I wanted to be sure I made in response to Judge Pillard's question, which is no one is saying, not even the government is saying, that a particular rebate or discount process must be implemented through the PPA. Remember, at Joint Appendix 336, government counsel said below, if we conclude that these rebate models, subject to our preapproval authority, are valid – of course, there is no such authority – then we wouldn't amend the PPAs. We would just do it just as we did the ADAPT. So, it's only if the secretary concludes that it wants to prescribe a particular rebate or discount model in the PPA itself that you get into this whole question about amending the PPA. Other than that, what both the secretary and we were talking about below is, you just implement this as you did with the ADAPT, which is, we trust that the parties to this agreement and the covered entities are going to engage in standard business practices. No one disputes, as I said earlier, that these rebate models are standard and customary business practices. So, if this court concludes, as it should, that there's no roving preapproval authority or that the preapproval authority is only underneath the PPA, then the answer is these letters should be vacated and the manufacturers should be permitted to implement their standard rebate practices. I understood – oh, please. Go ahead. I understood there's maybe a third argument, that even if there is a roving preapproval authority, these letters were arbitrary and capricious. It seemed like your strongest argument on that was that the letters did not address the non-assertion of a preapproval authority in the ADAPT or product replenishment situations. And usually a relevant question, if we got all the way to that question, would be, did your clients ever bring that past practice to the agency's attention and say, for example, you should not assert a preapproval authority here because you did not in these two prior instances, before the letters were issued? The short answer is yes. And let me give you some sites. Lilly argued it at Joint Appendix 119 and 491 to 492 and Joint Appendix 623. I think those are all Johnson & Johnson arguments. VMS argued it at Joint Appendix 716 and 725. Novartis argued it at Joint Appendix 815. Same with product replenishment. Joint Appendix 119, Lilly. 725, VMS. 816, Novartis. So the argument certainly was made. You're also right, Judge Garcia, that the only reason we get to that kind of part of the dropdown menu is if you conclude that there was preapproval authority, that it doesn't need to be located in the PPA, despite that sandwich of the rest of the statutory provision. And then I think the question is, HRSA plainly didn't explain itself when it came to not preapproving ADAPTs. And it certainly didn't explain itself when it came to sort of permitting this product replenishment post hoc rebate regime to grow up. So at the very least, in those circumstances, you'd have to go back and demand that the agency reconcile those positions. But you don't even need to get to that if you agree with us with what the statute says. I've got a question about the first Novartis case. And when I read it, I thought, well, we've given them a whole lot of, I mean, the manufacturers, a whole lot of running room. Why? Because the statute is silent. And Judge Katz has began by saying statutory silence implies that private parties may act freely. But here we have agency silence because we don't, the statute says, as provided by the secretary, rebate and discount. And then we have HRSA, who has, which has just never provided that, never done anything with that. So I guess my question is, how much can we rely on the first Novartis? I think Novartis is not, I would say, controlling here, precisely for the reason that you point out. It's a close cousin, though, because I think the point Novartis reached, which is, the Novartis panel reached, which is the statute, unless it says otherwise, permits manufacturers simply to engage in customary business practices. We are confident the courts can sensibly adjudicate questions down the road if they need to. That is the part that I think is particularly important here. Because here, where you have the agency able to, but has not yet, implemented something in the PPA, the only place it can do it, prescribing a particular rebate mechanism, discount mechanism, then that Novartis fallback, I think, is where you land, which is customary business practices. We all understand that this is how it has worked. This is how it should work here. When you have a situation where eligibility is determined after the fact, the normal business process is for there to be a rebate. That's normally how it's done. And I think the same, the statute here prescribes one way for HRSA to exercise some authority over a rebate or discount process. When it hasn't, and HRSA has remained silent, Judge Henderson, the manufacturers are able, within reasonable bounds, to implement their own. So assume, and I know this isn't your position, but assume that the statute grants the Secretary the power asserted here to limit the mode of price discounting and to exclude the mechanism of rebates until it's concluded further study. Your, I take it your backup argument is that using that power for the first time required a reasoned explanation of a change in position? And... Sorry, go ahead. Sorry. Is that right? Just yes or no on that? It's kind of an improv answer. Yes, and. Yes, and it required the reasoned explanation for a change in position not because of some pre-Loper-Bright interpretive issue, but because the agency has exercised that authority in a differential way. So it's much more of a classic administrative procedure. That is assuming that we think that the ADAP is an analogous situation. You would have to think that the ADAP is an analogous situation and the product replenishment model is analogous. But I want to make sure we're talking about the same thing when we say analogous, because this is, I think, a point where the district court might have gone a little bit off the  The question is not whether ADAP rebates are similar to these rebates. The question is when a rebate is a rebate is a rebate and the Secretary is saying we get to pre-approve rebates, why did it not pre-approve the ADAP rebates? So the similarity of the programs is another question kind of beside. The Secretary might be saying we're going to pre-approve rebates when covered entities object to that. It's never before been presented with the question whether to assert a pre-approval authority when the covered entities object. Here we're going to do it. And that would be a remarkable insertion into the statutory factors or the statutory authority that the agency doesn't have. The idea that it would favor covered entities' preferences over manufacturers is not something. In assessing the proposed rebate program that your clients want dramatically shifts who bears the financial burden in implementing 340B. And we know the whole purpose of the 340B program is to give these discounts to safety net providers. And so your client's position requires those providers to give interest-free loans to manufacturers. And neither the ADAP nor the product replenishment model does that. So it just seems that it makes a lot of sense that Congress would have left that choice to the providers but not left that choice. It's seen as a different choice if manufacturers want to impose it unilaterally without the Secretary's input. And especially given the language of the statute that says as provided by the Secretary. But I was, so my question was I thought you were making an argument that the Secretary is using this power for the first time and that it needs to have a reasoned explanation. And your first answer was, well, it needs to have a reasoned explanation because it's allowed other actors without expressed secretarial approval to do this. And that assumes that there needs to be preapproval as opposed to that the Secretary can provide, see somebody doing something and say, no, we don't want that. We're going to provide that you can't do that, right? But so I guess the question is if we assume that the product replenishment and ADAP are materially different, are you still arguing that there needs to be reasoned explanation for the agency's fresh use with respect to your clients of the Secretary's power to provide the mechanisms? The short answer is yes, but I would like to give my longer answer. The first is to correct an important factual misunderstanding. ADAP's, the ADAP model, the rebate model, and product replenishment both require in the first instance a commercial purchase. There is no distinction in that regard between ADAP rebates, product replenishment, which of course is precipitated by a commercial price purchase, and the kind of rebate model we're talking about here. That's factual point one. Legal point two is under the statute, manufacturers are permitted to offer the 340B price through rebates. That is the text of the statute itself. Now, you'll hear Mr. Schultz in a few minutes talk about how you should just erase that part of the statute. It really should just be discounts. But the statute itself says rebates. Rebates mean pay the commercial price, get your money back on the back end. Then the third point I want to make is with respect... Subject to the secretary providing otherwise or no? Subject to the secretary in the PPA, which itself would be subject to various administrative procedure processes and challenges, providing otherwise, yes. But third to your point, I want to make clear that what we're talking about is something that is highly unusual, by which I mean highly favorable to these covered entities. We are talking about rebates within 7 to 10 days, which the administrative record also shows might even put money back in the covered entity's hands before they even have to pay the wholesalers for the drugs that they got delivered. So the kind of scare tactics of the covered entities, which are not reflected, by the way, in the government's reasoning below about them having to carry a huge amount of float, are disproved by the prior practices, which also require float, are permitted under the statute to the extent there's any float. And there's really no float at all in these circumstances. I take it that what's at issue here for your clients is data that helps them determine duplicative claims or overt use. And I guess one way that our Novartis decision bears on this is at least under that decision, your clients can already request as part of their offer to sell products, 340B products, to providers at discounted rates. They can include in those offers requests for reasonable claims data. And if that's true, then why do you need this rebate program to generate the data? I think as a factual matter, that data has, shall I say, not been quickly forthcoming. There's a lot of kicking and screaming and even litigation about producing data. But more to the point, what we're talking about here is not just producing data. It's imposing some order on a process that, as we described in our brief, is completely runaway and results in third-party administrators, the CVSs and the Walgreens of the world, going back weeks or sometimes months and finding what they think are 340B purchases that they can then post hoc get what we're calling a product rebate rather than money back. So that's what we would like to impose some reason and order on. That is what produces the real danger of duplicative discounts. And that is what also adds to the danger of diversion. But for our purposes, it's the duplicative discount issue and the need for data quickly in real time that would actually solve a huge amount of the problems that manufacturers have been operating under for about 15 years. So just a question on how the Secretary could provide. I understand the statutory argument that it's only in the agreement and that they lack rulemaking authority, but just separately as a practical matter, it would be completely normal to provide through informal adjudications, right? If they did have some sort of approval authority, you would come to them and ask for approval and they would do it. I mean, that's a big if, though, because our whole point is that the Secretary doesn't have any kind of roving statutory authority. It's got extreme. That's why I used the word stingy earlier. Congress has been extremely stingy with the authority that's given HRSA. It can do three types of rules and it can do the PPAs. So the idea that Congress would kind of create in this parenthetical is this separate authority that it could do some separate way that it really hasn't specified. That's the parenthetical wagging the dog, essentially. This has to come in the PPA if it is to come at all. And what you've already heard the agency say below is we don't see the need to amend the PPA. We would just do this just as we did with the ADAPS. And that's an easy solution. We agree with that. Customary business practices, you just implement them. Life goes on. No one has to amend the PPA at all. Well, I think they would say what they did with the ADAPS was decide that the concept is allowed and leave the details to the industry. What they did with the ADAPS was decide after the fact that the concept was allowed and leave the details to the industry. Our point is they don't get to decide up front the concept is allowed. We get to implement our customary practices. And the agency, if it wants to prescribe something different and particular, it can go back into the PPA and do it. But it need not go into the PPA. The default is, just as in any other contract, standard customary business practices. I just wondered if the state and regional hospital associations argue that there's not any real conflict between the maximum fair price and the product replenishment model. You can do the maximum fair price prospectively. Does that solve your issue? No. It doesn't. I mean, the maximum fair price, to the extent that manufacturers want to effectuate it for a rebate, they have to do that rebate in 14 days. And that's specifically provided for by CMS. So, no, the whole problem here, as we described in our briefs and our briefing below, is that the manufacturers have been put to this impossible task of trying to effectuate an MFP rebate within a certain period of time with no idea about whether a new claim for a purported 340B rebate is going to come down the pike for that same purchase in six weeks or three months. That's the issue. Okay. So, you can move quickly in – I'm a little bit confused, actually, about you're saying you would process rebates very quickly but not if you've given upfront discounts? Oh, no. I think the problem is who's moving and at what speed. Under our rebate programs, the manufacturers would give rebates directly to the covered entities within seven to ten days, full stop. When we're talking about the MFP rebates, manufacturers are required to rebate the difference back to the government purchasing authority within 14 days max. The problem crops up because of the belated weeks later, months later, or almost resuscitation of a claim that purports to be for a 340B patient. And that's the algorithm that we call the black box algorithm that third-party administrators, CVS and Walgreens all make their business and make a fair amount of money going back and finding prescriptions from past dispensations. Aren't your clients wanting to just do their inverse version of the same thing?  Our clients are just wanting – They want to de-duplicate. So, everybody's looking for what they think they're entitled to, and it takes – so the question is sort of should the secretary look at that and decide the best system? And you're saying, well, don't stop us from doing what we're doing while it does that. And I'm not sure I see that the secretary lacks power to do what he's doing or the sense in allowing this new process. I know you say it's the customary process, but the rebates is relatively new under 340B. So were conditions on delivery to contract pharmacies, those were relatively new under 340B and similarly grew up because of the abuses of the 340B program. So I don't think the newness has any bearing on whether these are actual customary business practices. If anything, the unusual, highly unusual practice here is for covered entities to seek an in-kind product rebate months after the fact for stuff they purchased months ago that they now say they're chewing up to a 340B purchase. That's, I think, the issue. But I want to answer the point that you made about the secretary having authority to do this. Again, the secretary's authority is limited by the statute. It always is. The statute says it can do so only in the agreement. It doesn't have some kind of free-floating authority in that parenthetical to do something outside the agreement that makes no logical sense whatsoever. Do you dispute that in the agreement they could say no rebates allowed? I don't dispute that they could say it in the agreement. What I would want to reserve judgment on is whether that would be subject to its own challenge. But it wouldn't be subject to a statute. My question is would that be subject to a statutory challenge or just arbitrary? If I were thinking kind of academically about whether it could be subject to a statutory challenge, I would argue if the secretary in the PPA said only discounts, no rebates, I would come in and say the statute says any rebate or discount. But that's a down-the-road problem if the secretary chooses to implement their authority in the PPA only by selecting discounts. And the other problem, of course, it would have is what we've talked about at length in our briefing below, which is this is the cleanest, quickest, most efficient way to get money back into the hands of the covered entities. So the fact that the secretary would, in your hypothetical, Judge Garcia, be prioritizing a discount system that is notoriously opaque and produces the kind of duplication and diversion risks and actual occurrences that we've been talking about would suggest that it would have a significant arbitrary and capricious problem on its hands as well. Okay, thank you. So, I'm sorry, Ms. Stetson? Is your view that the regulations approving the ADAP rebate models that were already in effect were necessary? In other words, that those models were operating unlawfully until then? No, I think the models were operating perfectly lawfully. Who knows what was going on in 1998 and why the agency felt like it wanted to put a finer point on the issue? Maybe the comments and questions shed some light on that, because a lot of the comments and questions, as I said, were directed to this issue of, well, how do these rebates work? What are the mechanisms? So it was an information gathering. It fulfilled an information gathering function for the agency, but in your view, what weren't necessary? The regulatory... I don't think they were necessary. They are instructive, though, because where the agency ultimately landed was to say, and that's Joint Appendix 410 to 414, look, all these questions about the particulars of the rebate program, we are going to leave it to the manufacturer and the covered entity to work out the details. And that's all we're asking for here. Thank you. Thanks. Thank you. All right. Mr. Handwerker. May it please the Court. Jeff Handwerker for Appellant Johnson & Johnson. I want to start by responding to some of the questions that you asked my friend, Ms. Detson. The PPA here is a unique type of contract. The Supreme Court in the Santa Clara case said that the PPA is a statutory opt-in, so it's a contract that enables manufacturers to opt into the statutory scheme. Because of that, Judge Henderson, my answer to your question about the difference between agency silence and statutory silence is there is no difference in this case. The agency silence in the PPA is the equivalent of statutory silence because the PPA is essentially part of the statutory scheme per the Supreme Court's holding in the Santa Clara case. A number of points flow from that. This Court's decision in Novartis becomes significant. In that case, as the Court knows, you evaluated whether statutory silence on delivery conditions allowed manufacturers to proceed freely using customary business practices and answered the question in the yes. The same is true here. If you look at the PPA, as my friend noted, Section 2A, which is JA-436, specifically hews very closely to the language of A-1 in the statute. And as Judge Garcia noted in his questions, it specifically says manufacturers must charge a price no higher than the ceiling price. HRSA could have gone on and said something about the parenthetical. It could have said manufacturers. It's a little confusing because everything you're saying just confirms that this whole case just turns on what it means to charge the ceiling price. And nobody talked about that in their brief. You assume that there is no statutory default and it's just customary business practices. The government assumes that there is some other statutory default that you need permission to diverge from. And again, maybe the other Novartis case is helpful to us, but it does not discuss this statutory language and whether there is a baseline default pricing mechanism. It is not informative on that question. The ceiling price is a statutory formula that derives from the Medicaid rebate statute. The formula is the average manufacturer price minus the Medicaid unit rebate amount. So one conceivable reading of this statute would be when the ceiling price is $100, you must go to the covered entity and say, you can buy my drug for $100. You cannot go to them and say, buy my drug for $200 and I'll give you $100 next week. And we need to know which reading is the right one. So why is the right reading that you get to charge $200? In the pharmaceutical pricing context, the transaction price is the list price net of discounts or rebates. That is a standard business practice in the pharmaceutical industry. It's recognized in a number of contexts. For example, in the Pharma versus David case, the court specifically said in evaluating what prices needed to be disclosed under a California transparency law that it was price net of discounts and rebates. In the Robinson-Tapman context, when you're evaluating whether a price discrimination has occurred in the pharmaceutical space, you look at the price net of discounts or rebates. Under the Medicaid rebate statute. I appreciate all of that in common usage. I'm not saying this is correct. But if I were to just stare at these words, the amount required to be paid, you're either going to require them to pay $100 or $200. And then there's a parenthetical that says taking into account any rebate or discount. And it's a little bit odd to say amount required to be paid on its own envisions using a rebate. And then having a parenthetical that says maybe you can use a rebate. It suggests that the preceding term doesn't envision the use of a rebate, doesn't it? Well, I think it does. I think it suggests that the amount required to be paid could take into account a rebate or a discount. As allowed by the secretary. Well, as provided by the secretary, right? Not as approved or allowed, but as provided. Yes, you're correct. There's a second sentence in A1 that I think is important. And it's, as you all noted when my friend was speaking, it's the shall offer provision. The shall offer provision was interpreted by this court to mean make a bona fide offer. And the court parsed the words price and offer and reached the conclusion that offers could include various terms. The court also went on to say that manufacturers are free to impose reasonable conditions on their offers so long as those conditions do not result in a covered entity paying a price higher than the amount required to be paid, higher than the 340B ceiling price. In the context of a rebate, here the rebates are being paid within 7 to 10 days. J&J's proposed rebate model in this case had a 7-day commitment. It also has a technological feature that would allow payment of the rebate upon purchase rather than upon dispense. So it's not the situation like what the interveners are suggesting, that there could be six months or longer between the time they purchase a drug and the time they're paid the rebate. That compares with the current discount model, and I just want to explain this a little bit for the court. Under the current discount model, drugs are purchased through wholesalers and then sold through to pharmacies. The pharmacy then would dispense to a patient of a 340B entity, and then at some point after the fact, that sale would be recognized as a 340B eligible sale, and there would be an invoicing process back to effectuate the 340B price. That takes a much more significant period of time than the rebate models that are proposed in this case. So as my friend noted, the actual impact of the rebate models here on covered entities will be significantly less than under the standard wholesaler payment terms, as we note in our brief. With respect to the other questions that were asked, the must-offer provision plays an extremely important role in this case. The must-offer provision provides a limiting principle on the impact of rebates on covered entities. If there is a situation where a rebate model results in a covered entity paying more than the 340B price, the covered entity has remedies under the statute. They could pursue an alternative dispute resolution. HRSA could impose civil monetary penalties. There are significant consequences to manufacturers if they do that. So this is not a case— Isn't this kind of their whole view of this case? You say, no big deal, rebate, it'll be easy. And they're saying, no, this is a huge change, and we don't have the money to do it. And we don't trust that you're going to give it to us in 7 days. So that's exactly why the secretary has to kind of come in and settle the dispute. So there are a few points to unpack from that, Judge Garcia. First, the claims data that are required to be produced here, the record is replete with information about this, are standard claims data that covered entities collect and provide in transactions in other contexts. They have provided similar claims data with respect to contract pharmacy sales per the Novartis case. So this is not an undue burden on covered entities. Second, the rebate— If they're providing it as a standard matter, I had the same question that I had of Ms. Tetson about, you know, if we've already held a Novartis that you can request reasonable claims data as part of your offer to sell, then why do you need this rebate program to get the data? The challenge is under the current system, Your Honor, the claims data are not available in a timely fashion. Rebate models will enable data to be provided in real time, which is extremely important, especially when you think about the Inflation Reduction Act deduplication requirements that my friend mentioned. So the rebate models provide for a faster turnaround of that data, which allows for the deduplication that is needed. And if you over-deduplicate, the remedy for the providers is what? So the deduplication will occur not in the 340B program. So the 340B providers are going to receive the 340B price through the rebate. If there is a deduplication, it would be to other purchasers, not to the 340B entities. So there's two sides to the deduplication, Your Honor. There's the 340B discount, and then there's a discount to someone else, like the MFP or another party. And any deduplication here would occur not in 340B, but rather with the other party. So the covered entities are going to be made whole with the rebate within the 10-day window, 7- to 10-day window. All right. Thank you.  Mr. Boldt. May it please the Court, Maxwell Boldt for the government. The 340B program exists to enable safety net healthcare providers to stretch their scarce resources in order to serve some of the nation's most vulnerable and underserved populations. The Secretary is conscious that suddenly upending the system covered entities have relied on for three decades, risk imposing additional costs and burdens on providers, and consequently reducing patients' access to care. As I think the Court has recognized this morning, this is a dispute over whether the Secretary may take steps before this happens, whether he may take steps to study and address these concerns before new manufacturers may switch from upfront discounts to rebates. Plaintiff's position is that they may unilaterally implement rebates for whichever providers and drugs they choose on largely whatever terms they choose, and the Secretary has not reserved the power to review, disapprove, or condition the rollout of any rebates. So consistent with that view, each plaintiff gave the Secretary a short-for-use ultimatum. Eli Lilly, for example, after the system operated the way it has for 30 years, demanded a response to his proposal within 19 days and proposed to implement its model 39 days later. And then when it didn't get immediately what it wanted immediately, it sued. But Section 340B permits rebates and discounts only if provided by the Secretary, and the Secretary has not made provision for the rebates plaintiffs propose. Therefore, the statute prohibits plaintiffs from rolling out rebate models until the Secretary signs off. I have six reasons why our statutory interpretation is correct. I think that's where the meat of this dispute lies. I'd start with the text, which says that the Secretary must provide, he must make provision. So, yes, there are rebates and discounts, but the Secretary has to provide for them. He has provided for every other form of rebate or discount or payment method that has occurred before this point, but he has not provided for the ones plaintiffs have proposed. Sorry. Is your position that there is a statutory default pricing mechanism? So if the Secretary never provided for anything, what are the manufacturers supposed to do? No, our position is that the statutory, what the statute requires is for the Secretary to make some provision before, to enable 340B pricing to occur. And if you were to, I'm sorry, I didn't want to, so. You can finish your sentence. I just have a question about this, but. Yeah, so if you were to look at, for example, Congress passes this in 1992. It sets an effective date in 1992. The pricing agreement comes out later, and the first guidance comes out both in early 1993. And nothing has happened to this date, and the agency has to say, okay, here's how it's going to work. You need to true up for everything between the effective date and when you sign your agreement, and then going forward, the agency described this sort of upfront discount scheme. But at every point, the agency said, this is how you're going to do it. So it seems like HRSA has previously exercised this power ex post. I mean, it doesn't seem to be necessarily essential to your position that the Secretary must pre-clear any program in order to provide for it. For example, with the state ADAPTS, they were doing it, and then it was approved ex post. And that would suggest that the statute does not require ex ante providing for the program. And by the same token, it could provide, and I think it has provided, that it's not going to allow the rebates of the petitioners here. It's going to do a pilot program, study it, and then decide whether to provide for it. So how much is really riding on this notion that the Secretary has to pre-clear any program in order to provide for it? Our central argument is that the Secretary has to make provision. That could be, as he's done with cash, sorry, with upfront discounts, saying this is the default system, go and run with it. I would dispute the premise that the Secretary has done retroactive approvals. If you were to look at the ADAPTS guidance, it makes clear, this is the 1997 guidance, quote, most ADAPTS have direct purchasing systems that prevented their participation in the Section 340B discount program. So they were not participating in 340B. They were negotiating sort of program to manufacturer discounts that would replicate what they could get if they could get into 340B. But the guidance makes clear. We've pointed to sort of contemporary agency documents that say they're outside the program and they're being undercompensated by millions of dollars because they don't have all of the agreements with all of the providers. And the Secretary said, this system, this sort of informal system that you come up with seems to be working. I'm going to take it from being outside 340B and bring it inside the 340B fold and then recognize it and then allow it to go forward for all ADAPTS. But that is not a retroactive approval because it was happening sort of outside a program that the ADAPTS could not access. What's the answer to the similar question about the product replenishment model? Yeah. So I would point you to what the Secretary said in 1994, which is that there's no requirement for separate inventories. And in 1996, again, there's no requirement for separate, parenthesis, physical inventory because a separate data system will be used to verify property dispensing. The product replenishment model is essentially a combination of two things. It is a combination of fundable inventory and upfront discounts. It is not in any meaningful way, I don't believe, a rebates program. So you would say that was approved in the 1993 guidance. If we read the 1993 guidance to say, I provide for discount program. Yeah, 94 and 96 saying that we don't have to do the inventories, 593 saying the basic model is discounts. Again, I think the Secretary has discretion in how much control he wants to exercise. So you could say something like with ADAPTS, like the system you seem to have works, I'm bringing you inside the fold, do what you think makes sense. Or he could provide more detail, as he did, for example, with the pilot program. Victoria, you asked about the pilot program. I just want to make clear, the pilot program, I think, you know, as of now, BMS, Janssen, and Novartis are all participating with their negotiation program covered drugs. And so that solves some of their concerns. But the Secretary has not sort of said how the pilot program affects whether and when and what he's going to do with the proposals that are still before them. So that has not changed our position on sort of the finality of any decision that the Secretary just hasn't made on what to do with these rebate proposals. So how could, so one of the, as you go down the chart of arguments, one of the arguments is that the Secretary didn't adequately, first I didn't adequately explain why it was intervening here when it hadn't in the past. And I take it, at least as to, for ADAPT the answer is it wasn't 340B and for product replenishment it's not even a rebate program. But that's not in the letters, right? So the discussion of the, why the product replenishment structure is different is discussed in the letters. The Johnson & Johnson letter at 455 has a couple of sentences saying, you know, ongoing purchases after this initial sort of purchase is at the 340B price, distinguishing it. As for the ADAPT, the administrative record contains the 1997 letter, which explains sort of everything I told you. It's not in the letter itself, but this is an informal, whatever this is, it's an informal adjudication. So we're in Overton Parkland and you just need a discernible path from the record to what the Secretary said. But I'd also say the agency's position is one of consistency, that this is what we have always required. And, like, you know, FOX versus FCC says that if you change your position, you have to have a more, there's a heightened standard for explaining it. But the converse of that is if you're just acting consistently, like, you don't need to explain every time why you're being consistent. The agency's view is that this is how to support. I had not read the 1993 guidance to say, I will provide that the only way of pricing is going to be through an upfront discount and nothing else is required. Is there a citation for somehow where we can look to discern that? So I would say if you were to look at 58 Federal Register at 27291, the Secretary says, quote, the manufacturer must sign an agreement with the Department, agree to charge a covered entity a price for covered outpays, and agree not to charge a covered entity a price exceeding a bunch of words that mean the ceiling price, retroactive to the date of the bill. So I think that's describing, as the Secretary said, I think in 1996, like that part, sorry, in 1997, that describes only this sort of process. They definitely said the backhanded thing in 96 or 97.  But the language you read runs right into the argument that they are making, which is that charge the ceiling price itself assumes that you might do so through a rebate or a discount, and that that is common practice in the pharmaceutical industry. Is that your response directly to that argument? I think our response is that if you were to look at sort of what the agency has done consistently, for example, in the 90s, taking the position that like ADAPS could not access 340B pricing through rebates and recognizing that as a real problem and producing reports trying to figure out how to deal with that problem, like that is just inconsistent with the idea that rebates are permitted and that they can just do it. Let me ask it this way. Yeah. If the following sentence, the amount required to be paid shall not exceed the ceiling price, if that language, which is essentially what you read to me, prohibits a rebate model, then the statute prohibits a rebate model. And you told me that the statute does not set a default pricing mechanism. Right. Because the statute says, the statute does not prohibit a rebate model. It expressly contemplates a rebate model. Right. But it does say amount required to be paid shall not exceed the ceiling price. Right. Parentheses. Yes. Taking into account. Confusing words. But the point is, in the guidance, the language you quoted just says, it doesn't reference rebate or discount. It just says, you shall not charge a price above the ceiling price. Right. And I think that silence is, you know, an indication that you have to do the normal method, which is like the rebate, you have to do something different. And maybe, Your Honor, you could take that to say that there is a, that means that discounts are the normal, the default. I don't, when you asked me that question before, I took you to be asking, did the Secretary have to authorize, have to make provisions for discounts? And our answer to that is yes. You know, whether you would want to read that as sort of the ordinary way and rebates require more, I don't think a lot turns on that. I wonder if you could respond to Mr. Handwerker's argument that there's no feasible way of ensuring deduplication between the 340B discounted price and the IRA discount, given the timeline of the IRA discount and the current structure of the 340B program. What would it mean for manufacturers to give the MFP prospectively? I'm not sure, Your Honor. My answer to that question is that the pilot program solves it. You know, when the opening briefs were filed, there was a problem. By the time that we filed our briefs and the replies were filed, I think that problem disappeared. But the pilot program is only for a certain part of that market, right? Well, but it's for drugs covered by the negotiation program, which is where this deduplication program exists. Okay. So there were 10 drugs in the initial year, and that's what's covered here. Okay. I want to talk for a second about sort of these pricing agreements and how they function and what they are. You know, my friend Ms. Stetson pointed to the fact that we said that we wouldn't amend the pricing agreement to implement rebates, and that's exactly right because, as the Supreme Court explained in ASTRA, they are a regulatory option device. They aren't setting substantive terms or limits on sort of how this works, and they're not certainly an exclusive regulatory device. And so, yes, the agency's position is that, you know, unless the court were to read this provision very differently, to say that, like, everything has to appear in the agreement, which is never has been understood, no amendment to the agreement would be required. It is simply this means of opting into the scheme. But I think the idea of shoving everything in the manufacturing agreement doesn't work either for a couple of reasons. First of all, you know, the agency has tinkered with, like, a little bit of language here and there over the years, but it has made only one substantive change, and that was after the Affordable Care Act said the second sentence of A1, these things must expressly be in the agreement. So the agency, you know, asked for viewpoints on what the language should say, and then it asked manufacturers to sign an addendum because that's what the statute then required. There have been other changes that the agency—that Congress has made to the statute that have not gone into the agreement because those are not—there was no language saying, and you must put these in the agreement. The agency's view is that manufacturers are still bound by those, but I don't know what their view would be if everything has to be in the agreement. And it's also— You remind us when you say there are other changes that Congress has made to the agreement without—I'm sorry. There are other changes they've made without putting them in the agreement. What are you thinking of? So there are all in Section 340-256B, subsection D-1B, Romanets 2 and 4, has an obligation for manufacturers to provide rebates in certain circumstances. That's a statutory obligation, not the agreement. D-1B, Romanet 5, requiring manufacturer audits in certain circumstances. D-1B, Romanet 6, a different type of civil modesty area penalties. D-3A, a different dispute resolution than what the agreement contemplates. This is all the stuff that Congress has done over the years. The agency has not gone and changed this agreement because it's never viewed it as a device where it's anything more than an opt-in. Is there—are they making a distinction between something that entails secretarial discretion and something that is just required? I'm not sure. So, for example, you know, as provided by the secretary, the secretary's making a choice, and they're saying, well, that has to be through the agreement. Is that—are the provisions that you're citing provisions in which there's similarly some kind of discretion on the part of the secretary? Or does that not matter? I don't—I want to look at the text more closely before I definitively said there's no discretion involved. I certainly don't want to foreclose the secretary's decision. They're not really making that argument. Yeah, but that's not—I don't think that makes much of a difference. I mean, to the extent that their argument that it requires discretion so they need notice, we think the notice comes from the statute because that's where the obligation comes from. I'll also point out that, you know, everyone came to the agency first with some varying levels of asking for permission versus saying we're going to do it. But no one said—thought, like, if we just—we're totally allowed to do this. If we just sort of start doing it, let's see what happens. I think it's understood that this is something that the agency is going to have to weigh in on to some extent. Some of our questions were getting at this sort of big picture statutory question of who leads and who decides. And on one view, you would assume the secretary decides first. But another reasonable view would be that industry comes up with innovations and new ways of trying things, and they are constrained by the duty to give bona fide offers. And if they stray too far, they'll face various penalties, and I suppose you could even find cause and terminate the agreement. Why is that? I mean, maybe your argument just doesn't hinge on this, but do you think it would be absurd and bad to have the manufacturers lead, and why? Yeah, I think it would be inconsistent with the scheme Congress designed. If we were to look at ASTRA, right, this is a case about whether corporate entities or third-party beneficiaries of the contract, the court's reasoning turned out two things. One, it's not that kind of contract, and two, the secretary is in charge of this process. To the extent that the court finds it helpful, the legislative history, the House Report at 12 says that price reductions will be implemented at the discretion of the secretary as either point-of-purchase discount or rebate or other mechanism. If you look at the text, which says, as provided by the secretary, that's there. But I'd also look to sort of the potential practical consequences here. The view that the plaintiffs have put forward in their letter to the secretary, in their briefing here, I think it's at the podium here, is that it's not a relevant legal consideration what impact this has on covered entities. So if you look at the Johnson & Johnson letter, they say the secretary's first question is, have you studied the impact of this proposal on the scope and breadth of health care access? And Johnson & Johnson starts their letter saying, we don't think any of this is legally relevant. We don't think you should consider this. But here are your answers. So I think there's a real problem where you have essentially two industries with competing interests and an agency in the middle to say that despite Congress's design, we're going to turn it over and just let one half of the equation regulate itself. You know, the agency is not saying, has not said rebates are good or bad. We haven't said these proposals should go forward or shouldn't. But what the agency has said in their letters, in these lists of questions they put forward, is we have concerns and we want to study them before you can move forward. And the record contains at least enough evidence to say these are concerns that should be addressed. There's the letter from 340B Health saying that, you know, there are smaller entities operating at rates within margins that couldn't handle these costs. There's a letter in the record at JA891 from 189 bipartisan members of Congress warning that the model would reduce resources available for providing services to patients' communities. Yeah, the 340B program contains some major hospital systems. It also contains small community health centers that don't necessarily have the ability to turn on a dime. The Secretary's view is that he has to consider these things and figure them out. And whatever decision he makes, one group or the other is probably going to sue and I'll have to justify it. But, like, the framework is that he can mediate these things and prevent a sudden change. So that, you know, after 30 years of the way something's operated, 58 days later it all changes with whatever consequences. So this is a record-specific question, but when I asked you earlier whether there is a response in the letters to this claim that there was a departure from the ADAP and product replenishment approach, you cited the J&J letter, and that's true. Yeah. But the other letters do not respond to the product replenishment example, for example. Does that mean we have to vacate and remand those letters for more explanation? I don't think so, for two reasons. One, if I recall correctly, the second J&J letter, at the very least, was posted, like, online. The agency position was known. And the position that the government took- We should just read that as applying to the other- The position the government took in district court and that both sides have used to their advantage or disadvantage is that there's one administrative record that's considering all these things together and it sort of read things across the letters. You know, if that's the position, you know, if you want to remand with instructions for the agency to put that paragraph in the letters, you could do that, but I don't think that's going to help very much. I want to make two more points quickly. The first is plaintiffs have put a lot of weight on the shall offer language. I'll note that was added in 2010. So by their reading, Congress created a scheme that from 1992 to 2010, they actually could have just done whatever they wanted without these good faith obligations, and that doesn't seem to make sense of the scheme together. The second point, I want to get back to something I was saying about the manufacturers agreement, which is to just say what amending the manufacturers agreements over the objections of the- I'm sorry, the pricing agreements over the objections of the manufacturers, what that would mean is just sort of uncharted territory. My friend Ms. Sefton called these down-the-road problems, but if this court issued a decision saying that manufacturers can do what they want and we'll figure it out later, you know, the agency has never tried to amend these agreements over the objections of the manufacturers. I'm really not sure exactly how that would work. I'm not taking the position they can't do it, but I'm saying there's a lot- there would be open questions there about how this whole process works and what's required and what factors they have to consider, what process they have to use. And so we're looking at, you know, a difficult process and lots of litigation and potentially manufacturers just sort of taking over the secretary's regulatory role for years while we sort this out. I understand the plaintiff's position to be that if in 1992, when he was only contemplating- or 1993, when he was only contemplating discounts, if the secretary had put in the agreement the words, use discounts or rebates, but only rebates if you've asked me first, this would all be fine. And I think saying that this whole system turns on like a potential oversight that was made 30 years ago at a time when no one was contemplating this problem because it's not in the agreement, even though, you know, the structure and the text of the statute doesn't make clear that it has to be in the agreement. I just-I think if your statutory interpretation is getting to that point, you should look at it with a new set of eyes. All right. Thank you. Thank you. Bill Shultz. May it please the court, Bill Shultz for the interveners. There are three aspects of the drug company's programs which make them unlawful. First, under these programs, the drug companies will decide whether the 340B drug is being purchased for lawful use. And this is something that really was not mentioned, but is critical, but not mentioned by the plaintiffs. Second, the discount is paid for by a rebate rather than upfront. And third, the drug companies would require the providers to provide data to be used to make this determination. And there doesn't seem to be any limit as to how much data could be required. I'd like to address each of these. First, under the rebate plans, the drug companies decide whether the provider's claim for a rebate is valid, whether it is for a 340B patient, and they decide that before providing the rebate. They would do this by reviewing the data provided by the 340B covered entity. And only if it's satisfied that their test is met would they pay the rebate. In essence, and this is, I think, the most critical point I want to make, the drug companies will be taking over enforcement of the law and enforcing the law before the discounts are provided, or in their case rebates, rather than after the fact. And this, we think, is flatly inconsistent with the way the 1992 statute is structured and the way it has always been interpreted and applied. Today, under Section 340B, the providers purchase the drugs from the drug companies at 340B prices. The provider keeps records. And any questions about the legitimacy of that purchase are answered after the fact by audits conducted by HRSA or by the manufacturers. I have a sort of threshold question about these issues. These arguments might be persuasive, but why are they ripe for decision now? HRSA's position is they have not made a final decision on whether to approve or not this rebate program. And your arguments would suggest that they shouldn't approve them, can't approve them. But isn't it premature to resolve those questions? Well, the difference we have with HRSA is we don't think there is authority to approve these rebate programs. Absolutely. And my point would be you could certainly file a lawsuit challenging the pilot program on that basis. But I'm curious whether this is the wrong time and wrong vehicle to make that argument, because HRSA hasn't – or maybe they have. They haven't really taken a definitive position on these models. Well, I mean, I think the posture of the case is HRSA has said to the companies, you can't go ahead with these programs without our approval. And the companies have come back and said, no, no, we don't need your approval. And what we're saying is there is an authority to do these programs anyway. And I want to get to the rebate point, that we don't think they can do rebates. But this is a different point, and it's one that really wasn't discussed previously. But it's the key point, because the whole point of these programs is not whether it's paid through a discount or rebate. It's whether the companies get to decide whether the 340 claim is legitimate. Is this a legitimate 340B patient? Is this something we should pay? And if they decide no, then they don't pay the discount or rebate. And that's a huge shift. And what we're saying is it's inconsistent with the statute, because the statute set up a fairly elaborate system of audits that happen after the fact. And those audits would be unnecessary. Essentially, the companies are getting the information up front, and they're really flipping the script and deciding. I also want to point out, I think this is contrary to the Supreme Court's decision in Astor v. Santa Clara County. In there, you had providers, not the companies, but providers pursuing the companies about the discounts. And they were saying, you're not complying with the statute. And they had a third-party beneficiary theory based on these provider agreements that we've been talking about. And the Supreme Court said, even though you're a beneficiary of the contracts, that Congress set up a system where HHS was supposed to do the enforcement, or HRSA was supposed to do the enforcement. And it said to the providers, you now want to enforce the statute. But under the statute, HRSA doesn't. Well, we think the manufacturers are doing it on the other side here. And essentially, they're saying, we're going to enforce the statute. We're going to decide whether these are 340B patients and basically take that away from HRSA. The second reason, in our view, that the plan violates the statute is we think that rebates are unlawful. And they have been since 2010. In 2010, as part of the Affordable Care Act, Congress expanded and strengthened 340B. It included provisions to ensure the accuracy of ceiling prices calculated by the manufacturers, included the Civil Money Penalty Authority. But it also amended the first paragraph of the first subsection of the statute, that's A1, by adding a second sentence. And that sentence says that manufacturers participating in the 340B program, quote, that the agreements for the manufacturers, quote, shall require that the manufacturer offer each covered entity covered outpatient drugs for purchase at or below the applicable ceiling price. In other words, the offer has to include the discount. It has to be at or below the applicable ceiling price. And that language, we think, doesn't leave room for rebate. It really codified the way the whole system had been structured and run up to that point. The one exception is the ADAPS, and I'm going to talk about that in a minute. But this is the way it had always been done, and Congress codified it in language that we think plainly does not leave room for rebate and doesn't leave room for debate. And would it outlaw the inventory control model, you know, the, I'm forgetting the exact name. Oh, the replenishment model? Replenishment model, right. No, and let me explain why. In the replenishment model, the, essentially the hospital, if it's a hospital pharmacy, or the pharmacy sells the drug to the patient, and then the provider, the hospital, or the provider goes and every time purchases the drug at the 340B price. There's no rebate involved there. The only thing is the notion that they are buying them not at or below the applicable ceiling price in the first instance to get that thing rolling. And I guess that's not true if it's a contract pharmacy, but if it's the provider and they have in inventory the covered drugs that they purchase at retail price, then they are in effect buying them at or above the. I mean, that's an argument that the drug companies make, but they don't, once they sell the drug to the patient, and it's a 340B drug, then after they sell it, they go buy it at the 340B price. They don't, under this model, they're not buying it before they sell it, but once they sell it, they go back and buy it at the 340B price. And they do that every time. And so there's no rebate really that's involved in that. It seems to me very different from a rebate. And, you know, the only other way to do it would be to buy it in advance, but it doesn't seem to me to matter whether you buy it in advance or after the fact. The point is when they buy the drugs, they're buying them at the 340B price. Maybe I should say a word about the ADEFs too, because they are, the key difference there is that it's voluntary. In other words, the statute says that the manufacturers have to make the drugs available at the 340B price. And then if a provider comes, in this case it's the ADEFs, and they can't because, I can't explain why, but it's totally impractical to do upfront discounts, because they only had one pharmacy and the ADEFs were for the whole state. And so they voluntarily work on an agreement with the drug companies where the drugs are purchased and then after the fact they can get the rebates. That's very, very different from what's being imposed here. And obviously the costs are very different as well. On the point that the statute prohibits rebates, HRSA acknowledged this in their letter to Sanofi, in this whole back and forth here, and it's cited in Judge Friedrich's opinion at JA399. The courts below, both courts below said that this second sentence, if you read it to say no rebates it would be inconsistent with the parenthetical language that we've been talking about in the first sentence, taking into account any rebate or discount as provided by the secretary. But the problem with that is that paren modifies amount required to be paid. In other words, the first sentence is the secretary enters into an agreement under which the amount required to be paid, taking into account any rebate or discount as provided by the secretary. So this is not how the money is paid, rebate or discount. It is what the amount is. And this paren gave the secretary authority, you know, presumably for good reasons, to adjust that amount. And as we pointed out, there are twice, there are two times back in history when the secretary has exercised that authority and adjusted the amount. Once for new drugs for which there was no average sales price, and once for drugs where inflation was so great that the actual discount amount exceeded the price. And so that resulted in the penny pricing policy. Finally, I want to say a word about the data requirements. That's the third sort of piece of all of this. As has been pointed out in the Novartis case, the D.C. Circuit said data requirements could be imposed, but it said it understood that in that situation the burden was minimal and part of ordinary business practices. There the requirements were imposed on the pharmacies. Here, as I understand what the companies are proposing, would be data requirements not just from the pharmacies, but from the hospitals and other providers. And I think the record shows they can be very burdensome. They can require hiring different people and compiling different data and so on. And I think as George Contreras pointed out, it's unclear if rebates aren't permitted what they would use the data for anyway. The data is very much connected to the rebates, which, as I've argued, are not permissible. If there are no further questions, I thank the court. Why don't you take five minutes? Thank you, Your Honors. I'd like to make three quick points. The first is, in the last five seconds of Mr. Baldy's argument, you heard him say something that he had not said before, which is that the statute permits the secretary to make this provision outside the PPA. That was the statement that I'd been waiting for for the entire argument. He made it right before he sat down. Maybe the reason is that there really is no statutory support for that principle. As we discussed when I was last up here, the statute talks about the requirements for an agreement, the secretary entering into an agreement, the price under the agreement. So the only way that this court could conclude that that parenthetical, taking into account any rebate or discount as provided by the secretary, actually empowers the secretary to do something completely outside the agreement is by saying the secretary has some power that is otherwise constrained to within the agreement in that provision, just not that parenthetical part. And I didn't even hear Mr. Baldy making that argument today. Point number two, Mr. Baldy spent a lot of time talking about how the secretary was acting consistently when it came to, for example, the product replenishment program. The first thing is I want to make very clear Mr. Baldy talked about how back in the 1990s, the agency approved a certain type of commingling inventory. We are not complaining about shelving processes. What we are complaining about is this new system that the covered entities and their contract pharmacies and the third party administrators have developed in going back weeks or months and purchasing at 340B prices to make up for products long since dispensed. That is what we are complaining about, not shelving. And if that is something that is even housed as a rebate or a discount, questionable, then if the agency presumes to be acting consistently, I would expect to see the same kind of public notice threatening covered entities with termination from the program unless they get preapproval for their product replenishment systems. Third and finally, this question about amendment of the PPAs. I think I hear all of us in vehement agreement that the agency does not need to amend the PPAs. The manufacturers can simply do what they do as reasonable contracting entities, which is impose standard business practices, including rebates, including discounts as the parties, as the manufacturers choose. But here is the kicker. What you heard at the beginning of Mr. Baldy's argument was the manufacturers are suggesting that the secretary can't review or disapprove what the manufacturers are doing. Of course it can. If the secretary concludes that the manufacturers are not acting reasonably, if they are implementing crazy rebate programs, if they're implementing something that is simply outside the pale, the secretary has all sorts of nuclear artillery available to it to punish that manufacturer for doing what it's doing. But on this record, what the manufacturers are doing is extremely well within standard business practices, quite beneficial to the covered entities, in fact. And on this record and under this court's decision in Novartis and under the plain text reading of the statute, the manufacturers should be allowed to implement those rebate programs. That's one question. If we set aside the first argument, which I know you don't want me to, but I now take the government to be saying that our early guidance, the combination of them, it's not just that they talked about shelving, is that they affirmatively provided for a discount model. And that's why you've been allowed to do a discount model for the last 30 years. And we have not provided for a rebate model. It's as simple as that. Right. So a couple of answers. The first is a lot of this is post hoc rationale. And this is not just, as Mr. Baldy said, kind of shedding more light on the path they followed. This is just new stuff going into the record on appeal. But more importantly, when you talk about approving a discount model, if that, in fact, is what it does, I think you pointed out it's not like they said, we approve the discount model. You have to read between and underneath the lines to get that. But even so, the product replenishment model is nothing approaching an upfront discount model. So if the secretary has approved a discount model, then the covered entities have a real current problem with the way that they've been doing business. Is there no further questions? Thank you. Thanks, Your Honor. Let's see, Mr. Why don't you take two minutes? Oh, my goodness. I'll be quick, Your Honors. I just want to respond briefly to some of the points made by my friend, Mr. Schultz, for the interveners. First, J&J's rebate model at issue in this case simply validates whether a purchase has been made and a dispense has been made by the 340B entity. It does not look into whether it's an eligible patient or not, and I just wanted to clarify that. The J&J model at issue in this case does not change the universe of eligible claims under the 340B program. Second, the intervener's argument here would read out the word rebate from A1 in the statute completely. Their only response to that is to point to the penny pricing guidance from HRSA as well as the new drug guidance. Neither of those documents, neither of those guidances or regulations, refers back to A1 as the source of authority for its promulgation. The penny pricing was under their civil monetary penalty authorization from Congress, and the new drug did not assert any authority at all in the statute. So there's nothing that they have pointed to that suggests that the word rebate in A1 means anything other than its plain meaning of rebate. I would also note that their argument, if accepted, would invalidate the ADAP rebate program. They have no response to that other than to suggest that ADAPs are voluntarily and manufacturers are voluntarily participating in a rebate model, but that's the side point. If a rebate was not permitted in the statute, they wouldn't be allowed to do it. Finally, just a quick word about the pilot program. J&J is participating in the pilot. We appreciate that HRSA has done this. I note that the pilot is time limited. It is testing a new technology, and our expectation would be that if the pilot is successful and HRSA decides to roll it out, that they would do so through a PPA amendment. Unless the court has any questions, I will conclude. Thank you.
judges: Henderson; Pillard; Garcia